## IN THE COURT OF APPEALS OF IOWA

No. 22-0311
Filed May 11, 2022

**IN THE INTEREST OF A.L.,**
**Minor Child,**

**A.C., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Annette F. Martin, Cedar Rapids, for appellant mother.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Julie Trachta of Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

In this termination-of-parental-rights case, a mother took many positive steps toward reunification with her three-year-old daughter, A.L. But she was held back by an abusive relationship with the child's father and continued drug use. Focusing on her child's best interests and their bond with one another, the mother appeals.[1] We affirm based on our de novo review of the record.[2] *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

## I.      Background Facts and Proceedings

The mother gave birth to A.L. in 2018.[3] Early on in her pregnancy, she tested positive for methamphetamine, cocaine, and heroin. But by the time A.L. was born, she and the baby were negative for all substances. In assessing whether services were needed, the Iowa Department of Human Services noted that A.L.'s father was a "downfall" for the mother due to his substance use and history of domestic violence. Yet the department did not recommend any services for the mother because she was already "participating in treatment and utilizing resources and services to be successful."

Unfortunately, in March 2019, the mother relapsed on methamphetamine. Her relapse was reported to the department. During its investigation, the

---

[1] The father's rights were also terminated. He does not appeal.

[2] In conducting this review, "[w]e are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re Z.K.*, ___ N.W.2d ___, ___, 2022 WL 1051578, at *5 (Iowa 2022) (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)). "Our primary concern is the best interests of the child." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

[3] A.L. is the mother's third child. Her parental rights to the older children were terminated several years ago because of her drug use.

department again noted concerns about domestic violence between the mother and father, which the mother denied. The report was not confirmed since the mother did not use in the child's home or around the child.

The mother was brought to the department's attention again in September 2020 when a report was made that she "was walking up and down the street with [her child] in her arms in a peculiar manner and was asking people for 'ice.'" Hair stat tests of the mother and A.L. were positive for methamphetamine. The mother was arrested for violating her probation on drug-related charges, and A.L. was removed from the mother's care. She was adjudicated as a child in need of assistance and placed in the home of a maternal step-cousin.

Over the course of proceedings, the mother has consistently participated in visitation with A.L. Providers have noted a strong and loving bond between the two. The mother also obtained suitable housing, completed substance-abuse treatment in January 2021, and provided negative drug screens for several months. But she has been unable to extricate herself from the child's father. In the early part of 2021, the father began to repeatedly break into the mother's home. The mother sought a civil protective order, but the petition was dismissed when she failed to appear for the hearing. The mother refiled her petition, and a protective order was entered in June 2021, though it was quickly violated by the father. He was arrested at the end of June for "striking [the mother] with his fists and feet" and threatening to "beat her like a man." A criminal no-contact order was entered, and the father pled guilty to domestic abuse assault.

During the time when the mother was in contact with the father, she began to test positive for methamphetamine. Her first positive result came in April 2021

through a sweat patch test. She continued to provide positive sweat patch tests for methamphetamine through July, though her urinalysis tests were negative. Despite these positive tests, the mother refused to admit she was using methamphetamine. Instead, she blamed the positive results on her exposure to other people who used the drug. She also maintained that one of her medications caused her to test positive for methamphetamine. But a letter from her medical provider stated the medication would only cause a positive result for amphetamine.

A petition to terminate both parents' rights was filed in August 2021. The October trial was rescheduled for January 2022 because the mother was sober and no longer involved with the father. Soon after the trial was rescheduled, the mother again tested positive for methamphetamine, though at a low level. And in December 2021, someone provided the department with a video showing the mother and father together at a Christmas gathering in violation of the two no-contact orders. The mother testified she only went with the father because she was scared about what would happen if she refused. The juvenile court did not buy this excuse, noting the video showed the mother "was not an unwilling and uncomfortable guest, as her trial testimony would have one believe. She appeared to be comfortable and enjoying herself."

The juvenile court then found that while the mother

> has reason to fear for her safety from [the father], her behaviors have caused her protestations of fear to have little credibility. The Court has serious doubts that [the mother] has any protective capacity with which to keep [A.L.] from being exposed to more violence between herself and [the father], and it is clearly in [A.L.'s] best interest not be exposed to her father's substance use and violent behaviors.

The court terminated the mother's rights under Iowa Code section 232.116(1)(h) (2021).

## II.     Discussion

Although we apply a three-step analysis in conducting our de novo review of termination of parental rights, *P.L.,* 778 N.W.2d at 40, the mother challenges only two of those steps—whether the child's best interests are served by termination, and whether a statutory exception applies and should be used to preclude termination.  We accordingly focus on those steps.[4]  *See id.* (stating we need not address a step the parent has not disputed).

We begin with a consideration of the A.L.'s best interests, which requires us to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."  Iowa Code § 232.116(2).  Those considerations lead us to conclude termination is in this child's best interests.

---

[4] While the mother's petition on appeal asserts the court "erred when it terminated [her] parental rights pursuant to Iowa Code [s]ection 232.116(1)(h)," she fails to target any element of that section as unproved.  Instead, she summarily states the "grounds for termination . . . have not been established by the facts in evidence."  Our rules of appellate procedure require more, as do our cases.  *See* Iowa R. Pp. P. 6.201(1)(d) (referencing Iowa R. App. P. 6.1401-Form 5) ("*General conclusions, such as 'the trial court's ruling is not supported by law or the facts' are not acceptable.*"); *see also Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."); *In re C.B.,* 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all encompassing argument is insufficient to identify error in cases of de novo review.").  So we deem any challenge to the statutory grounds for termination waived.

In reaching this conclusion, we do not overlook the progress this mother has made toward reunification. She participated in visits with her daughter and exhibited good parenting skills when doing so, moving from fully supervised to semi-supervised visits several times during the case. She completed substance-abuse treatment, complied with drug testing, attended therapy, and secured stable housing and employment. But for each step forward, she has taken two back. The mother has tested positive for methamphetamine seven times since A.L. was removed from her care, yet she persistently denied use and made excuses for her positive tests, "cast[ing] doubt on her willingness to overcome her addiction." *In re K.T.*, No. 21-0670, 2021 WL 3075733, at *3 (Iowa Ct. App. July 21, 2021). She has also failed to abide by two no-contact orders entered to protect her own physical safety and the safety of the child. Just one month before the termination trial, the mother lied to the department about contact with the father, calling into question her honesty throughout the case and her ability to protect A.L. from exposure to continued domestic violence. *See, e.g.*, *In re L.B.*, 530 N.W.2d 465, 468 (Iowa Ct. App. 1995) (finding a mother's ongoing relationship with her abuser presented a continuing danger to her child's well-being).

While the mother has struggled to maintain her progress, A.L. has been happily ensconced in the home of a maternal step-cousin since the fall of 2020. She is thriving there, as the mother herself acknowledged. And she is bonded to the step-cousin, her husband, and their child, sometimes calling the cousin's husband "dad." *See* Iowa Code § 232.116(2)(b) (stating the court may consider a child's integration into a foster family, including the possibility of adoption by that family, in the best-interests analysis). As A.L. has become more integrated with

the step-cousin's family, who is willing to adopt her, she has become less interested in visits with the mother, at times locking herself in the bathroom, refusing to eat, or asking to go "home." She does not have these behaviors with the foster family. A visitation supervisor testified, "It has been approximately fifteen and a half months since [A.L.] was removed from the home, and . . . viewing how her behavior changes so drastically, it's time that she be put somewhere full-time instead of back and forth for her behavioral needs." We agree and find that termination is in A.L.'s best interests.

The bond between the mother and A.L. does not change our conclusion. *See id.* § 232.116(3)(c) (stating the court need not terminate the rights of a parent if there is "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"); *In re A.R.*, 932 N.W.2d 588, 591 (Iowa Ct. App. 2019) (noting the factors in section 232.116(3) "are permissive, not mandatory"). Despite their loving connection, we must give greater weight to A.L.'s safety and need for a permanent home. *See K.T.*, 2021 WL 3075733, at *3; *accord In re H.S.*, 805 N.W.2d 737, 748–49 (Iowa 2011). Indeed, the professionals involved in this case testified that while the mother and child are bonded, termination would not be detrimental to the child. Like the juvenile court, we accordingly decline to exercise this permissive exception and affirm the termination of the mother's parental rights.

**AFFIRMED.**